UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Loralie Ann Musolf,

        Plaintiff,

v.                                    Civil No. 12-1591 (JNE/FLN)
                                       ORDER

J.C. Penney Company, Inc.,

        Defendant.

---

Nicholas P. Granath appeared for Plaintiff Loralie Ann Musolf.

Sonja J. McGill and Thomas J. Conley appeared for Defendant J.C. Penney Company, Inc.

---

        Plaintiff Loralie Ann Musolf ("Musolf") filed a complaint against Defendant J.C. Penney Company, Inc. ("JCP") asserting claims of sex discrimination and retaliation under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 *et seq.* Musolf worked for JCP as a Loss Prevention Supervisor. Her claims in this action stem primarily from three incidents of unwanted physical contact from a co-worker over the course of two days at the end of January, 2010. She complained to management and the undesired contact stopped. Subsequent events culminated in JCP suspending and then terminating Musolf's employment in September, 2010.

        Musolf asserts claims for discrimination based on a hostile work environment, retaliation, and promissory estoppel.[1] JCP moves for summary judgment, seeking dismissal of Musolf's complaint. For the reasons stated below, JCP's motion is granted.

---

[1] The complaint filed by Musolf also includes claims (Counts V and VI) for discriminatory discharge. On September 23, 2013, Musolf withdrew those claims. (Docket No. 75.)

**BACKGROUND**

**A.  Musolf's Employment and General Performance**

JCP hired Musolf as a Loss Prevention Supervisor in August, 2008.  Musolf began

working for JCP in St. Cloud, Minnesota.  JCP employed Musolf as an at-will employee.  As the

Loss Prevention Supervisor, Musolf reported to the Store Manager, Craig Child.

As an employee, Musolf received certain written policies from JCP.  One set of policies

outlined in a publication entitled "The Associate Guide to Winning Together" strictly prohibited

sexual harassment.  The publication also spelled out JCP's no-retaliation policy and confirmed

that employees could report good faith concerns about harassment without fear of retaliation.

Another set of policies called the Statement of Business Ethics required confidentiality of all

non-public information and records concerning any aspect of JCP's business.  JCP considered

violations of the policies outlined by the ethics statement to be grounds for termination of

employment.

During her time at JCP, Musolf demonstrated great talent for loss prevention tasks and

received multiple commendations from management.  At the end of 2009, she received a

Recognition ECard from the District Loss Prevention Manager, Grant Grassle, stating that her

team had "been doing an outstanding job these last few months combating shrinkage" in the

store and that they were "setting the standard for others to follow."  In March, 2010 she received

a certificate for "outstanding performance" in "Accident Claim Reduction" and a merit pay raise

in May, 2010.

While acknowledging Musolf's skill at identifying and apprehending individuals

attempting to steal JCP merchandize, Child had found the need to coach Musolf on effective

management of the Loss Prevention Associates that reported to her and on improving her

2

interactions with other employees. Child's performance evaluation for Musolf signed in April, 2009 stated that "Lori has a Great Ability to do Loss prevention work, she just needs to develop Team work within her staff and Store respect for her team." Musolf's evaluation the following year, signed by Child on February 19, 2010, reflected improved and overall positive ratings compared to the previous year.

## B. January, 2010 Events Involving a Co-worker

Musolf's claims of sexual harassment implicate the actions of her co-worker, Joe Pekarna, who worked for JCP as the Men's Department Supervisor at the St. Cloud store. Musolf's claims focus on three incidents on January 30 and 31, 2010.[2] Musolf first mentioned the incidents to Child and he asked that she document them by email. Musolf sent Child an email on the evening of January 31 regarding the first two incidents and another on February 1 regarding the third one.

On January 30, 2010, Musolf had been in an altercation with two unruly customers who threatened to kill her and Cherri Waddell, one of JCP's Loss Prevention Associates on Musolf's team, when Pekarna approached them. According to Musolf's first email, "Joe walked past us from behind and rubbed my back while asking me if I was okay." On the morning of January 31, Pekarna had requested Loss Prevention assistance with a customer accident and Musolf responded. Musolf told Child that Pekarna then rubbed her shoulder and told her about the

---

[2]      Musolf also describes reporting to Child in December 2009 that several young female associates in the Men's Department "were creeped-out and uncomfortable around Joe Pekarna." According to Musolf, Child responded by asking Musolf to monitor Pekarna. Musolf does not point to any subsequent mention of these issues or to any testimony that specifies any particulars about potentially problematic conduct by Pekarna. At her deposition, Musolf also could not name any of the women about whom she had been referring.

accident. Musolf's January 31 email voiced Musolf's shock at Pekarna's actions and requested that Child "speak to Joe as [she did] not appreciate him rubbing [her] back or [her] shoulder."

Musolf's email of February 1 reported another incident involving Pekarna on the evening of January 31. After Musolf had another altercation with a disorderly customer, Pekarna came up to her, grabbed her by the shoulder, and gave her a hug. Musolf's email communicated that "[t]his behavior needs to be stopped immediately as it is not appropriate [in] the workplace."

During the first week of February, Child met with Pekarna and Pekarna's direct supervisor, Paula Theisen, the Men's Department Manager, to discuss Musolf's complaints. Child told Pekarna that although expressing sympathy was acceptable, any type of unwelcome or unwanted touching was never permissible. Child instructed Pekarna never to touch another employee for any reason while working and Pekarna promised to comply.

According to Musolf, Child never followed-up with her. She asked him about the status of her complaint in the following months and he typically responded with words to the effect that he would take care of it. According to Child, he informed Musolf of his conversation with Pekarna in February itself. He claims that Musolf never complained about the matter to him again until she emailed his supervisor, Kobie Zimmerman, on September 2, 2010, following certain other events. There is no dispute, however, that Pekarna never touched Musolf again.

## C. The August 18, 2010 Meeting

On August 18, 2010 Child scheduled a meeting that he characterized as a coaching session with Musolf. The Loss Prevention Manager, Grassle, also attended. Musolf made notes of the meeting,[3] as did Grassle. According to Musolf's notes of the meeting, Child started out by

---

[3]     Musolf began keeping a "diary and journal of the events" from the August and September time-period. She submitted this typed diary as part of her filing in opposition to JCP's summary judgment motion.

telling her that he wanted to discuss some complaints from members of the management team that he had been receiving in the past four months.

Child explained that the way she sometimes came across to people and their perception of her was causing problems. Child raised three recent incidents, one from a management meeting where Musolf seemed agitated, one involving Musolf's treatment of associates after an escalator accident, and one regarding a confrontation with Pekarna in front of other employees and a customer over the time at which certain doors needed to be locked. The incident with Pekarna occurred on August 13, 2010 and he had submitted a written complaint about it on August 16, 2010. Musolf did not feel that she had done anything wrong in each of the incidents discussed and had a different version of the events than those who had complained about them.

Grassle then discussed Musolf's Loss Prevention team. Musolf and Grassle disagreed about whether problems existed. Grassle communicated his view that Musolf's attitude with her team had been an issue and associates had quit because of her. They discussed several associates who had left and Musolf pointed out the reasons, unrelated to her, for their departure. The record includes a May, 2010 email from one of the departing associates that references multiple difficulties in working with Musolf as the reason for his resignation. Grassle also discussed certain scheduling issues on her team and her correcting of some time-entries that he believed had led to perceptions of unfairness.

Overall, Grassle confirmed that Musolf's numbers of apprehensions were great and that she was setting standards for the district, but he had significant concerns about her treatment of others that needed to be addressed quickly. Grassle encouraged her to talk to the associates, with whom she had a hard time, to get feedback that could help improve her supervisory interactions.

Child also instructed Musolf not to retaliate against anyone because of the conversation. Musolf confirmed that she would not.

The conversation shocked and upset Musolf. She explained to Child and Grassle that she had been stressed at work and that they were part of the cause. In particular, Child pressured her on the "externals," and Grassle wanted her to focus on internal matters. They indicated that they would both back off and the conversation ended when Musolf received a call from the store floor. The topic of Pekarna's touching of Musolf did not come up at the meeting.

**D. Events Following the August 18, 2010 Meeting**

In the days after the August 18, 2010 meeting until Musolf left for a week-long vacation on August 24, Child and Musolf had a few more informal discussions. On the night of August 18, Musolf had called Waddell, one of the associates on her team, and discussed some of the topics covered in the meeting with Child and Grassle. Waddell told Child about the call. Child believed that Musolf's questioning of Waddell had significantly upset Waddell. Child then spoke to Musolf regarding her discussions with Waddell and another associate on her team. Musolf told him that she had just spoken to her team as instructed to do so by Grassle. Musolf also states that, during those conversations with Child, she raised the issue of Pekarna's inappropriate touching and noted that Pekarna should have been fired.

On August 30, when Musolf returned from vacation, Child set up a meeting with her. He had Kim Schmalz, the Assistant Store Manager, attend and take notes. Child raised the concept of retaliation and asked about Musolf's conversations following the August 18 meeting with him and Grassle. She responded that she had spoken to two team members to find out how she could improve as a manager. Musolf then declined to respond to any further questions. Musolf indicated that she had her documentation ready and would be "faxing it in to Corporate."

On August 31, Waddell sent Child an email. She mentioned that Musolf had told her she would be talking to a lawyer regarding the harassment from Child and Grassle. She also stated that Musolf wanted to sneak into Child's office to find the file on her and had asked if Waddell would be a lookout. On September 1, Musolf spoke to a lawyer.

On September 2, Child and Schmalz, again met with Musolf. Child began questioning Musolf about her conversations following the August 18 meeting. She again refused to answer him, contending that she had already answered his questions and was done talking about the situation. That day, Waddell informed Child that she had seen Musolf printing off documents from her desktop and a shared computer drive over the last few days. Waddell also told Child that she had seen Musolf give a large stack of papers to a non-employee friend who had come to visit her in the office. Musolf explains that "fearing the worst," she had "retrieved some of her own documents" that day.

Following the meeting with Musolf and the information from Waddell about the documents, Child emailed a senior Human Resources ("HR") manager on the afternoon of September 2. He recommended termination of Musolf's employment. He also recommended a suspension, while they made a decision, in light of the document issue.

At the end of the day on September 2, Musolf emailed Kobe Zimmerman, the District Manager above Child, about the incidents from January involving Pekarna. Musolf attached her two emails to Child from January 31 and February 1 regarding Pekarna's undesired physical contact. She stated that she was asking Zimmerman to "please resolve this issue immediately as nothing has been done as far as I know." Zimmerman responded the next morning saying he reviewed the actions that were taken and thought her concerns were appropriately addressed. He asked if there had been any incidents that occurred since February. Musolf emailed back to say

that "[t]here have been no further incidents as far as the inappropriate touching but Joe has, since that time, been very hard to work with and I still [*sic*] very uncomfortable around him."

On September 3, the HR manager that Child contacted agreed with his recommendations regarding Musolf. Child called a meeting with Musolf and Schmalz. He informed Musolf that he was giving her one more chance to cooperate. She again declined to have a discussion, stating that she had already answered his questions. He asked her whether she had printed documents from the shared computer drive and she denied that she had. Child then notified her of the company's decision to suspend her with pay, pending the outcome of the investigation into her conduct.

On completion of the internal investigation and relevant processes, JCP terminated Musolf's employment on September 9, 2010. The HR manager, a lawyer from corporate headquarters, Child, and Zimmerman were involved in the decision-making processes around terminating Musolf's employment. The company's "Reason for Dismissal" form lists three reasons for dismissing Musolf: "for failure to cooperate in a Company investigation, taking confidential Company information without permission, and attempting to involve another associate in a plan to sneak into the Store Manager's office and take documents without permission."

## DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce

admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must look at the record in the light most favorable to the nonmovant and draw any justifiable inferences in the nonmovant's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). But summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## A. Sex Discrimination Based on a Hostile Work Environment

Count III of Musolf's complaint claims sex discrimination based on a hostile work environment in violation of Title VII. Count IV makes an analogous claim under the MHRA. The parties do not dispute that the MHRA claim of a hostile work environment may be analyzed under the same standards that apply to Title VII claims. *See also Mehl v. PortaCo, Inc.*, 859 F. Supp. 2d 1026, 1031 (D. Minn. 2012) (applying the same analysis to both); *Goins v. West Group*, 635 N.W.2d 717, 725-26 (Minn. 2001) (applying the requirements of a Title VII claim to an MHRA claim).

Title VII prohibits discrimination on the basis of sex against any individual with respect to his or her compensation, terms, conditions, or privileges of employment. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (citing 42 U.S.C. § 2000e-2(a)(1)). Sexual harassment is actionable under Title VII only if it is so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment. *Id.* (internal quotation marks omitted). To establish a prima facie case of sexual harassment because of a hostile work environment, a plaintiff must show (1) membership in a protected group; (2)

unwelcome harassment; (3) that the harassment was based on sex; (4) that the harassment affected a term, condition, or privilege of employment; and (5) that the employer knew of or should have known of the harassment and failed to take appropriate remedial action. *Kratzer v. Rockwell Collins, Inc*., 398 F.3d 1040, 1047 (8th Cir. 2005).

JCP contends that Musolf cannot demonstrate the third, fourth, and fifth elements that she must establish for a claim of sex discrimination based on a hostile work environment. As to the third element, JCP contends that the evidence demonstrates that Pekarna touched Musolf out of sympathy following stressful events. JCP argues that while Musolf complained about the contact being unwanted and making her uncomfortable, she never characterized it as sexual in nature until she filed her discrimination charge with the Minnesota Department of Human Rights.

A plaintiff claiming a hostile work environment must prove that she was the target of harassment *because of her sex* and not merely point to non-actionable offensive behavior. *See Pedroza v. Cintas Corp. No. 2*, 397 F.3d 1063, 1068-69 (8th Cir. 2005). Ways in which a plaintiff might establish the harassment-based-on-sex element include showing that the complained-of conduct evinced sexual desire or showing that members of the plaintiff's gender were the primary target of the misconduct. *See id.*; *Mehl*, 859 F. Supp. 2d at 1031. The only relevant evidence that Musolf proffers on this element is of the physical contact itself and her descriptions of it. The evidence shows that on separate instances, Pekarna rubbed Musolf's back, rubbed her shoulder, and gave her a hug. Despite the absence in the contemporaneous evidence of any objective signals of a sexual or vulgar undercurrent to the contact, Musolf's emails from February, 2010 reflect that she found the contact shocking and inappropriate for the workplace. She currently characterizes the touching as sexual in nature. When the evidence is

viewed in the light most favorable to Musolf, the third element cannot form the basis for dismissal of Musolf's hostile work environment claim on summary judgment.

Nonetheless, summary judgment on Musolf's hostile work environment claims is warranted due to Musolf's inability to meet the fourth and fifth elements. The fourth element requires that the harassment be "extreme" and not "merely rude or unpleasant." *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 420 (8th Cir. 2010); *Alagna v. Smithville R-II School Dist.*, 324 F.3d 975, 980 (8th Cir. 2003) ("To be actionable under Title VII, the alleged harassment must be so severe or pervasive as to affect a term, condition, or privilege of employment."). For an actionable claim, the "sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Alagna*, 324 F.3d at 980 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).

The three incidents of physical contact here were limited to rubbing of plaintiff's back, rubbing of her shoulder, and giving her a hug in connection with stressful events and in the absence of any overt sexual or vulgar undertones. The conduct ended as soon as Musolf expressed her opposition to it. While Musolf stated in a September email to Zimmerman, the District Manager, that she continued to be uncomfortable around Pekarna, she admitted that he never touched her again. At no point did she identify to anyone in management any other conduct by Pekarna that made her uncomfortable. At her deposition, she did not specify any conduct by Pekarna related to her gender that made her uncomfortable. Consequently, the record lacks evidence of circumstances that could amount to continuing sexual harassment by a co-worker. Moreover, she waited seven months before escalating the matter to Zimmerman and did so only after issues over her own unrelated conduct had arisen. Based on these facts, no

reasonable jury could find that Pekarna's conduct was so severe or pervasive as to create an objectively and subjectively hostile work environment. *See LeGrand v. Area Res. for Cmty. & Human Servs.*, 394 F.3d 1098, 1102 (8th Cir. 2005) (collecting Eighth Circuit cases finding summary judgment proper based on the fourth element of a hostile work environment claim); *Duncan v. GMC*, 300 F.3d 928, 934-35 (8th Cir. 2002) (collecting such cases from other circuits).

Musolf also cannot establish the fifth element of a hostile work environment claim, which requires her to show that JCP did not take adequate remedial action. In her brief, Musolf does not make any argument or point to any evidence to support her position on this element because she contends that JCP "impliedly admits element 5—which it must because Musolf sent emails putting Child on notice." But in her emails to Child on January 31 and February 1, 2010 she asked that Child "speak to Joe as I do not appreciate him rubbing my back or my shoulder" and that the "behavior needs to be stopped immediately." Child spoke to Pekarna in the first week of February, 2010 and the behavior stopped immediately. Under such circumstances, there is no basis for finding JCP's remedial actions inadequate. *See Weger v. City of Ladue,* 500 F.3d 710, 723 (8th Cir. 2007) (noting that "[g]enerally, where the employer responds to a sexual harassment complaint in such a way as to promptly stop the sexual harassment, there is no basis for finding employer's postcomplaint actions not sufficiently corrective" in the context of a claim for harassment by a supervisor). Musolf does not make any argument, let alone a persuasive one, as to how or why JCP's remedial action could be deemed inadequate given that the only potentially sexually-harassing conduct that she identified to her employer stopped as soon as she complained about it.

**B. Retaliation**

Count I of Musolf's complaint asserts retaliation under Title VII and Count II alleges the analogous claim under the MHRA for reprisal. Title VII prohibits an employer from discriminating against an employee who has "opposed any practice made an unlawful employment practice" by the statute or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under it. 42 U.S.C. § 2000e-3(a); *Barker v. Mo. Dep't of Corr.*, 513 F.3d 831, 834 (8th Cir. 2008). The *McDonnell Douglas* burden-shifting framework applies to claims of retaliation when the plaintiff lacks direct evidence of retaliation. *Barker*, 513 F.3d at 834. In a retaliation case, "[t]he ultimate question of proof—the burden of which remains on the employee throughout the inquiry—is whether the employer's conduct was motivated by retaliatory intent." *Fercello v. County of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010).

Under the applicable framework a plaintiff bears the initial burden of demonstrating a prima face case of retaliation, which requires showing that: (1) the employee engaged in protected conduct; (2) the employer took an adverse employment action against the employee; and (3) a causal connection exists between the two. *Barker*, 513 F.3d at 834-35. If the plaintiff meets her burden of making a prima facie showing, the burden then shifts to the employer to articulate a legitimate non-retaliatory reason for the adverse action. *Id.* at 834. The burden then shifts back to the employee to put forward evidence of pretext to show that a prohibited reason, rather than the proffered one, actually motivated the employer's action. *Id.* The same three elements for a prima facie case and the burden-shifting framework applicable to Title VII

retaliation claims also apply to reprisal claims under the MHRA. *See Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 101-102 (Minn. 1999).[4]

JCP contends that Musolf cannot establish the third element of a causal link for her prima facie case and that she lacks sufficient evidence to present a jury question on pretext. For purposes of this motion, JCP does not challenge the first element of Musolf's prima facie case and assumes that she engaged in a protected activity. As to the second element, although the parties agree that JCP took an adverse action against Musolf, they dispute which actions constitute the relevant ones. JCP takes the position that Musolf's suspension on September 3 and termination on September 9 constitute the only adverse actions. Musolf argues that the August 18 meeting with Child and Grassle as well as Child's subsequent conversations with her also amount to adverse actions.

The August 18, 2010 feedback session with Child and Grassle does not amount to an adverse action for purposes of Musolf's retaliation claim. To qualify as adverse actions for a retaliation claim, the actions "*must be harmful* to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006) (emphasis added). In other words, the anti-retaliation provisions of the law only protect an employee against "retaliation that produces an injury or harm." *Sutherland v. Missouri Dept. of Corrections*, 580 F.3d 748, 752 (8th Cir. 2009)

---

[4]     The Supreme Court recently held that the causation standard applicable to a Title VII retaliation claim is a "but for" standard. *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013). The Court distinguished this standard from the one applicable to claims of "status-based discrimination" under 42 U.S.C. § 2000e-2(m), which provides that an "unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was *a motivating factor* for any employment practice, even though other factors also motivated the practice." *See id.* at 2522-26 (emphasis added). While the Minnesota courts have not confirmed after *Nasser* whether the "but-for" standard or motivating factor standard applies to MHRA reprisal claims, the Court does not find that the issue needs to be resolved to decide Musolf's MHRA claim.

(quoting *Burlington N.*, 548 U.S. at 67). Thus, criticisms and reprimands, do not, without more, amount to a qualifying adverse action. *See Clegg v. Arkansas Dept. of Correction*, 496 F.3d 922, 929-30 (8th Cir. 2007) (finding insufficient evidence of a qualifying adverse action for a retaliation claim based on various actions, including "negative reports and reprimands"); *Weger*, 500 F.3d at 727 (finding no materially adverse action in the absence of an allegation that notes added to the plaintiffs' personnel files had "any negative impact on their lives"); *Sutherland*, 580 F.3d at 752 (finding no adverse action for a retaliation claim where a worse evaluation after the plaintiff's protected activity did not result in any "reductions in pay, salary, benefits, or prestige"). While Musolf may have found listening to and discussing criticisms or complaints about her at the August 18 meeting an unpleasant experience, the session itself did not amount to any actionable harm. Likewise, neither did any of Child's subsequent confrontations inquiring into Musolf's actions following the meeting amount to adverse actions. The only relevant actions for purposes of the retaliation analysis are JCP's suspension and termination of Musolf's employment.[5]

### 1. Prima Facie Case

As to the third element of her prima facie case, Musolf lacks sufficient evidence that her complaints about Pekarna caused the suspension and termination of her employment. The seven-month lag between her complaints at the start of the year and the adverse actions in September[6]

---

[5] Even if the August 18, 2010 meeting were treated as an adverse action, Musolf lacks evidence to establish a causal link between her complaint about Pekarna's conduct and the meeting. The only fact representing the potential for a connection is the complaint by Pekarna just before the meeting. That fact, however, does not amount to evidence from which a reasonable jury could find a causal connection. *See infra* pp. 16-17.

[6] Musolf makes the point that she subsequently requested that Child inform her of the status of the investigation and resolution of her complaint. Those requests, including her final email to Zimmerman on September 2, 2010, all relate back to her original complaint and do not raise any new complaints. Nonetheless, even if Musolf could claim a shorter time period

creates a challenge for Musolf to establish a causal link between the two. *See Fercello*, 612 F.3d at 1080 (finding that a six-month gap had the dual consequences of weakening any inference of causation and precluding reliance on temporal proximity alone to establish causation); *Stuart v. GMC*, 217 F.3d 621, 635-36 (8th Cir. 2000). Musolf must point to indicators of causation "in light of a significant time gap." *See Fercello*, 612 F.3d at 1080. She faces a significant challenge to link the September events to those in January and February, given that she does not complain of any mistreatment in the intervening months. To the contrary, the evidence reflects that Child, the Store Manager, gave her a positive evaluation on February 19 and she received a merit salary-increase in May.

While Musolf points to multiple items, none of them, individually or collectively, amount to evidence from which a reasonable jury could find the requisite causal link. The only item, which at first blush, appears significant, is the temporal proximity between Pekarna's complaint on August 16 about an incident on August 13 and the August 18 feedback session with Child and Grassle. But a reasoned consideration of that fact confirms its immateriality to the question of a causal link between Musolf's complaints about Pekarna and any actions against Musolf. First, Pekarna was a co-worker with no supervisory authority over Musolf and was not a decision-maker in the adverse actions against her. Second, Pekarna's complaint had an undisputed factual basis that legitimized further inquiry into it. Musolf's own notes of the August 18 meeting reflect that an argument between Pekarna and her occurred on August 13 about proper store-closing procedures. While Pekarna's account and hers differ on whose voice was raised in the exchange, both accounts confirm a heated exchange. Musolf also does not dispute that the

---

between her protected activity and the adverse actions, she still faces a challenge. *See Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) ("Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation.").

exchange occurred in the presence of other associates and at least one customer. Under such circumstances, management's decision to meet with her to—at a minimum—inquire further into the incident does not suggest a causal connection to her complaint about Pekarna earlier in the year. Third, the August 18 meeting covered multiple topics and incidents, only one of which involved Pekarna. Fourth, at no point did JCP rely on Pekarna's complaint or the underlying incident as a reason for suspending or terminating Musolf's employment.

Despite the absence of sufficient evidence from which a reasonable jury could find the requisite causal link, the Court recognizes that a plaintiff's burden at the prima face case stage of the analysis is not onerous. *See Wallace v. DTG Operations, Inc*., 442 F.3d 1112, 1119 (8th Cir. 2006). Assuming, arguendo, that Musolf makes a prima facie case, her retaliation claim still does not survive JCP's summary judgment motion. Musolf cannot meet her burden at the next stage.

### 2. Pretext

Musolf lacks evidence from which a reasonable jury can conclude that JCP's proffered reasons for the adverse actions against her are pretextual. JCP offers three reasons for Musolf's suspension and termination: she failed to cooperate in an investigation; she took confidential JCP documents without permission; and she attempted to involve a subordinate in a plan to sneak into the Store Manager's office and take documents without permission. Methods by which an employee might prove pretext include demonstrating that "the employer's proffered explanation has no basis in fact" or by showing "disparity in the treatment of similarly situated employees." *See Logan v. Liberty Healthcare Corp*., 416 F.3d 877, 881-82 (8th Cir. 2005) (internal quotation marks omitted).

Musolf does not separately and specifically address the evidence of pretext as to each of JCP's proffered reasons. Instead, Musolf's brief indiscriminately unfurls a plethora of "issues" with the evidence in the record. But only genuine issues of material fact can preclude summary judgment. Musolf fails to raise any such issues on the question of pretext that warrant denial of JCP's motion for summary judgment.

As to JCP's first proffered reason of a failure to cooperate in a company investigation, Musolf's own notes reflect that she declined to cooperate with Child's inquiries on multiple occasions. Musolf's notes of the August 30, 2010 meeting reflect that when Child began questioning her about her conversations with her team members after August 18, she "became very uncomfortable" and "told him that [she] was not going to answer any more of his questions." After saying that "he could ask anything he wanted but [she] would remain silent" she stated that she "had had enough" and was leaving.

Similarly, Musolf's notes of the September 2 meeting reflect that Child attempted to question her again and she "stated that [she] had already answered his questions" and "was not going to continue to do this." At that meeting, Schmalz, the Assistant Store Manager, offered that Musolf could talk to her if she did not feel comfortable talking to Child, but Musolf told Schmalz she "wasn't discussing this anymore with anyone." When Child "stated that he needed to close this up and get some resolution to the facts [she told him] that he would need to use the facts that he thought he had." Musolf's notes of the meeting on September 3 also confirm that she declined to answer any more questions, stating that she had already done so.

While Musolf may have believed that she had adequately answered any questions and felt justified in declining to cooperate further with the Store Manager, the Court need not decide the propriety of her conduct and whether it merited dismissal. As the Eighth Circuit has repeatedly

noted, a court does "not sit as a super-personnel department reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination or unlawful retaliation." *See, e.g., Chivers v. Wal-Mart Stores, Inc*., 641 F.3d 927, 934 (8th Cir. 2011) (internal quotation marks omitted). Musolf does not dispute that a failure to cooperate in an inquiry or investigation violated JCP's company policies and her own notes confirm the factual basis for JCP's first proffered reason. Neither does Musolf present evidence that the actions against her differed from those against others in analogous situations, nor does she offer any other evidence that renders JCP's first explanation pretextual.

For the second reason of taking confidential documents, Musolf challenges JCP's evidence that she took any documents that were actually confidential or that she was not entitled to take. But the relevant inquiry is not whether she was actually guilty of the misconduct identified as grounds for termination, but whether the employer had a good faith belief that the misconduct occurred. *Alvarez*, 626 F.3d at 416 ("If the employer takes an adverse action based on a good faith belief that an employee engaged in misconduct, then the employer has acted because of perceived misconduct, not because of protected status or activity.") (quoting *Richey v. City of Independence*, 540 F.3d 779, 784 (8th Cir. 2008)); *Chivers*, 641 F.3d at 934. Again, Musolf's own notes confirm enough of the relevant events, such that she cannot establish pretext of this reason. In particular, JCP claims that Waddell told Child that she had seen Musolf print off various documents from a shared computer on or around August 30-31 and September 2 and also give an envelope of documents to a non-employee friend to take off the premises.

Musolf does not deny that these events occurred, but contends that she only "retrieved some of her own documents and personal items from her office." Musolf's diary entry for September 2 states that she had "already printed off Kim's documentation from 8/30 in which

there was some incorrect information," presumably a reference to the notes made by Schmalz at the August 30 meeting with Musolf and Child. Musolf's notes also describe her looking for documents she believed were "okay to take off the computer that could help me in my job search and to prove to Craig that I was not this bad person Grant was claiming me to be."

She goes on to confirm that she put documents that she printed in a manila envelope and asked a non-employee friend who had stopped by the store "if she just wanted to take the envelope with her and [Musolf] would get if from her later." Musolf's notes confirm that Waddell witnessed the event, and when Waddell said "I see nothing!" Musolf told her "there was nothing in that envelope that I couldn't take as it was my stuff." While, Musolf may have only taken non-confidential and/or personal documents, the record reflects enough to show JCP's good faith belief, whether or not ultimately correct, that she had impermissibly removed company documents. *See Alvarez*, 626 F.3d at 416 ("[A]n employer who investigates allegations of workplace misconduct is entitled to latitude in evaluating the information gathered, so long as the employer acts in good faith.").

As to JCP's third reason, Musolf denies that she had asked a subordinate to serve as a look-out while Musolf sneaked into the Store Manager's office. At her deposition, Musolf acknowledged commenting to the subordinate that they should search the Store Manager's office, but took the position that she was only joking. The record includes an August 31, 2010 email from the subordinate, Cheri Waddell, communicating to Child that Musolf had asked her to be a lookout while Musolf sneaked into his office to find the file on her.

Musolf makes much about the credibility and weight to be given to communications from Waddell in light of a declaration she submitted in this litigation. In the declaration, dated August 23, 2012, Waddell states that Child and Grassle had pressured her to send emails and a written

statement about Musolf in August and September of 2010 and that she was forced to make comments that were not true. The declaration goes on to clarify that Waddell "never heard or saw anything that would lead me to believe that Lori Musolf took any confidential information, or that she attempted to involve anyone in a plan to take any manager's documents without permission, or that she failed to cooperate in any company investigations." When subsequently deposed on June 10, 2013, Waddell reconfirmed the events described in her emails to Child and written statement from 2010. She also agreed that the key paragraphs of her declaration were not true, but testified that she agreed to the declaration because she felt sympathetic towards Musolf, who had come to her saying she could not find a job and requesting that Waddell talk to Musolf's lawyer.

Whatever disputes exist over Waddell's communications, they do not matter in light of Musolf's own admissions regarding the underlying events that form the basis for JCP's three articulated reasons for Musolf's termination. Those admissions confirm the factual basis for JCP's belief that Musolf had engaged in improper conduct, especially with regard to the first and second reasons proffered by JCP. Moreover, to survive summary judgment, Musolf must show *both* that the proffered reasons are false and that retaliation was the real reason for the adverse action. *See Stuart*, 217 F.3d at 634. "The core question in a retaliation case does not, ultimately, concern the veracity of the facts underlying an employer's legitimate non-discriminatory reason for discharging its employee, but rather concerns whether the employment decision was based upon intentional discrimination." *Id.* at 637 (internal quotation marks omitted). Musolf lacks sufficient evidence from which a reasonable jury could conclude that JCP retaliated against her for her complaint in January and February of 2010 about sexual harassment by suspending and firing her in September, 2010.

**C. Promissory Estoppel**

JCP also seeks dismissal of Musolf's claim of promissory estoppel. Under Minnesota law, a promissory estoppel claim requires proof (1) that a clear and definite promise was made; (2) the promisor intended to induce reliance and the promisee relied on the promise to her detriment; and (3) the promise must be enforced to prevent injustice. *Martens v. Minnesota Mining & Mfg. Co.*, 616 N.W.2d 732, 746 (Minn. 2000). Musolf contends that JCP's non-retaliation policies constitute a promise on which Musolf relied to her detriment in complaining about Pekarna's conduct.

Summary judgment on this claim is appropriate because, at a minimum, Musolf lacks evidence of the second element necessary for her promissory estoppel claim. For the same reasons discussed in connection with her retaliation claim, Musolf lacks evidence amounting to a case that should be submitted to a jury that JCP retaliated against her because she complained about Pekarna's conduct. Consequently, Musolf cannot show detrimental reliance on any promise by JCP about non-retaliation.

**CONCLUSION**

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendant J.C. Penney Company, Inc.'s Motion for Summary Judgment [Docket No. 30] is GRANTED.

2.      The complaint is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: October 11, 2013

s/Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge